The party's ready to proceed. I'm ready, Your Honor. I'm ready, Your Honor. All right, Mr Greenstein, you may proceed. Good morning. May it please the court. My name is Malcolm Greenstein. I represent Carlos Nerio. Officer Evans presented a probable cause affidavit to the Texas magistrate that contained numerous false statements and omitted material facts which resulted in the arrest of the wrong Carlos Nerio. The magistrate judge said the law was not clearly established. It was. Franks v. Delaware and his progeny have long held that an officer violates the Fourth Amendment in relation to an arrest warrant if he intentionally or with reckless disregard for the truth makes a false statement or omits a material fact from the warrant application and if the corrected affidavit with the false statement deleted and the omitted facts added would not support finding a probable cause. As we argued in the brief, no judge would have found probable cause and issued the warrant to arrest the appellant if Evans' affidavit had stated that he knew there were two Carlos Nerios and that all of the damning facts in the affidavit referred not to appellant but to the other Carlos Nerio. Counsel, I have a record question. I see in the record where Evans testified that he saw the two driver's license pictures that appear on record on appeal 245 and 246. What other information did Evans have about the two Carlos Nerios? At the time that he submitted the affidavit, he knew what they looked like because he had seen the other Carlos Nerio drive up to the site of the drug dealer's house, get out of the house, walk to the house, and then leave a short time later and drive away. So he saw what that looked like. He then compared the two Nerios because of the two driver's licenses and he would have seen that they were substantially different. Let's pause for a moment. So on the first part you just said, I understand the Evans' deposition to testify under oath and penalty of perjury that the Carlos Nerio that he saw, he Evans saw, enter the drug deal house is the appellant Nerio. Now, I realize that that's wrong, but that's what Evans testified to under oath. He did not say it was the other Nerio. He said it was appellant Nerio and he even had appellant Nerio in the deposition room while he's making this statement. And he Evans testifies again under oath and penalty of perjury that the man he saw go into the house is the appellant Nerio, right? Correct. So what other information other than these two pictures? So for example, you have three pages of your brief where you talk about the differences between the two people. Did he have their dates of birth? Did he have their heights, their weights? Did he have anything other than the two pictures that we see on pages 245 and 246 of the record? He being Evans, I'm sorry. He had the two driver's licenses, which would have shown the photographs, which would have shown the ages of the two people. So all I have on 245 is a picture of the appellant Nerio. I'm sorry. I don't have the 245 in front of me, but he would have. Evans testified that he looked at the two driver's license photographs, that he pulled up the driver's licenses. And if he had pulled up the driver's license, he would have seen the information that's contained in everybody's driver's license, which would have been the dates of birth and what the persons looked like. He also would have. Actually, that's not what he says in the deposition. What he says is he has the two pictures and I see the two pictures because those are what you put in the record. I don't see the other information. For example, I don't see on page 245 the driver's license number, the height of the appellant Nerio. I see that for the other Nerio. I see, actually, I don't have height, but I have date of birth. I have a driver's license number. So that's why I'm trying to, I'm trying to nail down exactly what Evans knew, right? Because you're saying he intentionally or misleadingly failed to include this. And so we have to know what he knew. Or recklessly, I believe is also the standard. Well, which one do you think it is? Do you think he intentionally did this? No, I think he acted recklessly. And so how was he, what is the information he had or should have had? He has these two pictures. I understand that. Well, the other information he had was apart from what they visually look like, he had information what the vehicle was that Carlos Nerio drove to the site, the silver Chevy pickup. And he had the license plate from that vehicle. He drove by the appellant's house on he had the address that was related to the license plate of the silver Chevy pickup. And that was at a Tapo street address where theoretically, and actually as it's pursuant to the affidavit of the appellant, that's where the other Carlos Nerio lived. He never drove by that address. He drove by. Isn't that because Lieutenant Leggett told him to go to the what was it wayward lane, the other one? No, I don't. My understanding is that is not part of the evidence. He was not told by her to go there. They went several times themselves. And I don't know whether he went by himself, but they never saw the silver Chevy pickup. He was never told not to go to Tapo street and investigate the address of the person to whom the vehicle belonged. And I don't mean to belabor it. I'm just trying to get a straight answer on the question. Did he? I don't see anything in his deposition or anywhere else in the record that Evans knew about the Tapo street. He was told by Leggett about the wayward lane address and he was given the two pictures, but I don't see anything about how he knew about Tapo, anything about heights, anything about weights, anything about any other details other than the two pictures. And he swore under penalty of perjury, he Evans, that the appellant Nereo was the one he thought he saw at the drug deal. I'm sorry. He also swore under penalty of perjury that Officer King had done a Facebook search of Carlos Nadeo, which was a lie. She said she did not. He finally, after the deposition, I believe, admitted or during the deposition admitted he had made a mistake. And in fact, he had not. He also, in that same affidavit that he swore to under oath, said that the residence that was connected to the telephone that was obtained from the tap was a residence. And in fact, he knew when he signed the affidavit that it was not a residence, that it was a business. So he's certainly twice in the affidavit under oath, did not tell the truth. And it seems to me that there is a what's the evidence that he knew there had been no Facebook? What is the his admission? He admits that he knew there had been no Facebook search and that he lied about. Yes. And it's also in the in the brief. It's an appellee's brief to counsel. What he says in the deposition is that he that they did Facebook searches for other people. And so he assumed that he had been done. But he doesn't say I mean, to judge Graves, his question doesn't say I knew that there was no Facebook search. And I lied in my my warrant application. No, I believe my recollection of what he testified to was that when he was asked whether Officer King had done a Facebook search of Carlos Neto, which he said in his affidavit that she had after she testified earlier deposition that she had not, he then admitted that that was false, that she had not done a Facebook search. Right. It's undisputed that there was no Facebook search. The question I think Judge Graves was asking, and I have a similar one, is what is the evidence that he knew there was no Facebook search? And that's not what he said. Do you have an hour away page for the deposition that I'm missing? He he's put in his affidavit a sworn statement that she did. And I don't have it right off the top of my head. I can certainly find that in rebuttal. But that was his testimony that he had not. And I'm not sure it's in the record. He had also testified that he used the same language in regard to a number of other affidavits. And so he just copied. So and Officer King was adamant in her position. That's not the same as an admission that he knew that no Facebook search had been done. I mean, you understand my question. It simply was what's the evidence that he knew that no Facebook search had been done? And I'm still not hearing that there is evidence that he knew that there had been no Facebook search. And it's either he knew or he was reckless about whether a Facebook search had been done. If he was reckless, then that still satisfies the standards set up by Franks versus Delaware. And that's all that's that is required is that he intentionally or was reckless about inserting facts in an affidavit that are not correct. In addition, he took no steps to do the investigation to determine whether or not he had the correct person when he had the photographs of the two people. And he did not go by the top of the lane and he went several times to Mr. Nadeau's address. And this is not a situation like a shooting or where there's an armed person on the street where an officer has to act quickly. This is a situation where he sits in an air computer and has as much time as he needs to draft the affidavit. And I think the facts in Hart versus O'Brien, a decision from this court, are instructive. Peggy Hart was arrested and charged with intent to distribute marijuana. And there was an arrest warrant. After the charge was is married to Stanley Hart, who was the drug dealer. Turns out that there was another Peggy Hart in the county, the wrong person. The officer had and it was held the officer was not reckless because he had no reason to believe that there were two Peggy Harts in the county or that the warrant. So that compares to this situation where Officer Evans knew there were two Carlos Nadeaus. And he knew that the two Carlos Nadeaus were different because he had the photographs of both of them. And he could compare them where the officer in the Hart case was determined that they did not act recklessly. On the contrary, in this situation, he did act recklessly because he had the information that there were two Carlos Nadeaus. Counsel, can I just get a yes or no answer to the question? Is there anything other than the two pictures on page 245 and 246 that suggest that Evans knew there were two Carlos Nadeaus? Anything? Anything besides the fact that he had two driver's license from two different people? He didn't know. That's my question. I mean, show me in the record. I don't see anything other than the two pictures that he had any reason to believe there's not two different socials, there's not two different DOBs, there's not two different driver's license numbers. He testifies at page 200 of the record on appeal that he had no idea about the top of lane address until his deposition. So I'm asking you, can you point me to anything in other than the two pictures that shows that Evans knew that there were two different people named Carlos Nadeau? I think he admitted it in his deposition. I can't give you the page right now, but I can. Yeah, he admitted that he knew there were two different Carlos Nadeaus. And that's near the end of the cross-examination regarding, and he stated that he was aware there were two Carlos Nadeaus. But you don't have a record? I can't give it right off the top of my head. I can find it for you. And very briefly, on the independent intermediary doctrine, the magistrate judge ruled and found that if the facts had been presented to him with the intermediary doctrine, he would not have granted it because of the false statements that were in the affidavit. I see my time is up. Thank you, counsel. Mr. Dennis? Mr. Dennis, you need to turn your microphone on, please. I got it. How's that? That's fine. Okay, I'm on. All right. Sorry about that. Good morning. Let's keep going with where, I think we're just going where we're at, which is let's keep talking about this affidavit, if that would be okay with the court. And what I think is important, and we're looking at the affidavit, Mr. Greenstein has already said, but he's left out a few important points regarding Franks v. Delaware. And one thing is that it points out is negligence alone in the creation of this affidavit will not defeat qualified immunity. And that a proven misstatement, which again, the Facebook, that's wrong. I fully acknowledge that. Agent Evans fully acknowledges that that was a mistake. But that can only vitiate the affidavit if it was established that the misstatement was a product of deliberate falsehood. And as we've already gone over in the record, Dario can't point to anywhere in the record where Agent Evans knew that this was a deliberate falsehood and included it anyway. He can't cite to anywhere in the record. So we either have deliberate falsehood or reckless disregard for the truth. What reckless disregard for the proof requires in that the Agent Evans, in fact, entertained serious doubts as to the truth of the statement. And there is absolutely nothing in the record that he had any serious doubts about this Facebook. He went what he was told when he understood from all to point the court to the different parts of this record, because I think that's the record is very important in this case. Okay, on page 1 56 of the record, Agent King says, All right, there's nothing. The Facebook was never conducted. She admits that All right. The question was, was the Facebook search ever conducted to your knowledge? No. Okay, got it. Now, then you go to Agent Evans. You go to the record at 206. And Agent Evans said he can conduct the search through the telephone number through Facebook. The source of the information was Agent King. She told you that? Yes. Okay. So he's going by what he was told. There's no information that he had anything in the record. There's nothing in the record that he knew that it was wrong when he was doing when he was writing up this affidavit. So then if we go to the affidavit itself, and I'm going to use page 326 and 327, we take the rest of the affidavit support probable cause, and I think it does. We have information that we have this Mr. Dones, who's a meth dealer. They confirmed that through several control purpose purchases with a cop, a cooperating individual. Agent Evans goes through and details how this, how it was submitted to the lab, turns up to be meth. He goes through and details how the confidential informant or cooperating individual, as they call them, is reliable. He goes through on paragraph five of the affidavit that they had, they got pen registers for Dones' phone. And one of the numbers came back registered to a cardless scenario. Now, going with the Ed Blustein address that's on paragraph five. Okay, the sentence itself reads, a check through accurate shows Nario resides at 7112 Ed Blustein Boulevard, Austin, Travis County, Texas. That's an accurate statement from what that statement says, because that's what the accurate came back on. While the address itself for Mr. Nario is obviously wrong because he resides on Wandering Way, the statement itself is accurate. Okay, so then we take out the Facebook page, then we go to this- But on that, they knew that address was not a residence. Isn't that correct, Mr. Dones? I don't think there's any evidence that Evans knew that it was an incorrect address. There's evidence that he knew that it was- No, what I'm asking is, they knew that there was not a residence at that address. Didn't the cops know that? Agent King, yes, Agent King looked that up and found out it was, in fact, the cricket office where he got the phone. All right. Correct. It's the store where he got the phone. Okay. So, okay, so we take that evidence, we just take that out. Then we have this phone call where it goes through paragraphs 10 through 13, obviously talking about this man's trying to buy some meth. Okay, I don't think this- You read that, the man's trying to buy meth. They go by, call ends, time later comes by, the man is seen coming out of Dones' residence, operated vehicle, registered to a Mr. Nerio. Okay, you take out the probable cause in this affidavit to believe that Mr. Nerio was involved in a drug transaction. All right. Now, one of the lynch, one of the things that you also talked about in Franks v. Delaware is, you know, if we take that out, is that really going to make a difference? And it's not from the standpoint of accurate check is already found the phone number as belonging to Mr. Nerio. Let me get that. I can give you that site. Okay. If you go to page 156 of the record, okay, 156. The question was, was a Facebook search ever conducted to your knowledge? No. And that's different from the accurate search. Correct. So we don't even need this Facebook to be done. The accurate search already came back to a phone registered to Carlos Nerio. So frankly, it's a belt and suspenders to even look at the Facebook page. They didn't need it. It's already done. They've got this phone number associated with Mr. Nerio. So that alone right there, the fact that there is nothing to show that agent Evans, in fact, provided a knowingly false or intentional intentionally false statement or at a reckless disregard for the truth. Therefore, there's no fourth amendment claim against him. And it's that also shows that there's an intermediate intermediate. I can never say it, but basically is insulated by the magistrate signing off on this, because even if you take out what is false, there's still sufficient probable cause. Okay, so let's talk about this capital lane information. What I think is very telling is that agent Evans, as I understand, is the only remaining defendant in this case, testified in his deposition that he was not aware of the capital land address until the day before his deposition. You go to the record at page 202. And it says question prior to your reading that interrogatory answer. Were you aware of a capital street address from Mr. Answer. I don't recall hearing that capital address until yesterday, so he didn't even know about it. So how can you fail to include and be reprimanded if he didn't even know about it? So there's nothing that he even knew about this tapestry of address or that he was drive by the time. Okay, there's nothing in the evidence to show that agent passed along evidence or that the afternoon saw this affidavit and said, Hey, you forgot to include this because if you go to page 1 73 of the record, she in fact testifies that that she didn't approve it. The question line 17. Did you approve the affidavit before it presented the match? No. So she didn't even look at it and approve it to build a say to agent Evans. Hey, you got a problem here. You're failing to include some information in there. No, it doesn't now. So there's nothing. There's nothing to show that he knew about this tapestry address and failed to include it. Now, let's talk about the visual of Mr. Mr Evans and Agent Evans makes of Mr Nerio in this case. Okay, we go to page 1 96 of the record. There's an intercept that's called made a call from meth at this point. All right. Then at the bottom of the page 1 96, you watch the person get out of the vehicle and go into the house. He's able. And then you go to page 1 97 when he's able to see him. Then the question was, do you recall how long the transaction took come down a minute or two? And then you go down to the bottom of the page of 1 97. He says, I see a man coming out. They run his, they run it. They run his license or the license plate. It comes back to Mr Nerio and his judge Oldham, as you pointed out, it's on page 1 98 and he's in question. Did you believe so? Yes. Okay. Is that the person that you saw sitting here today? He looks older, but has a different haircut, but yes. So he identifies the man sitting in his deposition right across the table from him. Oh God. I'm sorry. My bird just screamed. If I have to go water him down. Um, he saw the man sitting in the deposition, Mr. Dennis. Okay. He had a little trouble with your audio. No. Let me ask if they can give you some instructions on how maybe to improve the audio. Okay. I'm on the phone. All right. Is that better? The audio is much better. Go ahead. Okay. Again, I'm sorry. Okay. Oh, that's all right. It's not your fault. Okay. The top of the street address. Um, he testified. I think I just ended that and he asked, so we, and then we wrote the visual. That's where we're at. I'm sorry. So he verified as you all point out earlier, I think as judge Roland pointed out, you verified it in the deposition. Now let's go to the time when he looked at the two photographs, which is page two Oh seven through two Oh nine. And that's where he talks about the photographs. Okay. We're back. He's showing the because they weren't marked as exhibits in the deposition to my recollection. We don't have what to sort of ask you about. You're looking at that point, but she definitely says she knows it's this one guy. He indicates, so he's got a good idea. He knows what the guy looks like, right? Which he's already said in the deposition. And what I also find is this. And so he sees the pictures. He knows there's two guys. He points out the one. So why would he, why would it be exculpatory to have to include the other ones? He knows it's not that guy. Is it something happened? We can't hear you at all. Mr. Dennis. Okay. You can't press the mute button on your screen or on your phone. All right. Am I back? I think you're back on speaker and just put it down probably, right? Yeah, you could. We'll hear you. Good. It looks like it's an iPhone on the table. It's probably an old phone. Okay. What I find is telling is not just the visual from the photographs and not just seeing him, but agent Evans was the officer who actually went to Mr. House and arrested him and saw him there. So he had the opportunity to see this man come out of Jones's residence, drive away, have a car registered to him. And then see these photographs and says, it's definitely this guy. And then he sees the money arrests him. And you would think, let's be honest. You would think it's a whole holy. No, this isn't that guy. I didn't arrest him. I didn't see this guy. So why would he arrest him? So he sees him multiple times and still says he knows it's this guy. Okay. Now I'm trying to go to the other thing. Oh, the silver Chevy that was brought up. Okay. There's the evidence about the silver Chevy being at Jones's residence and that's Lieutenant Leggett coming up with that information on pages 163 through 164. Okay. And that's where it's brought up that there's a silver Chevy that drives away from Mr. Jones's residence. Now, if you go to the, to the record at page 202, which is others, his deposition was a post 14. And when you drove by an area's house, you didn't see the vehicle that's described here. The silver Chevrolet pickup. Is that correct? The answer is I, and that's just two years after the incident, I recall a Chevrolet pickup at his house. That was white or maybe it was a suburban. I don't, but he said, I don't specifically recall the Chevy. Okay. So he doesn't specifically recall it, but he knows he saw a Chevy pickup there. And this is two years after the deposition. So this is again, not somebody who's trying to hide something and say, oh yeah, I didn't see anything like that at his residence. So, you know, that's, that's, that's a non-starter also. There's no evidence that I ever saw to answer questions earlier that agent Evans ever saw the actual driver's license of the other Mr. Nerio. In fact, if the only part that shows this other Mr. Nerio, the only thing in the record is at age two 46 of the record. And this was the information about Carlos Nerio. But what agent Evans testified during his deposition on page two Oh seven, is he said he never saw this information regarding Mr. Nerio, all this information. He may have seen the picture. He never saw any of this other information regarding Carlos Nerio until after the lawsuit was filed. So again, he wouldn't even know about it. All right. And what I also find interesting is that you go down to the phone, the phone number for Mr. Nerio, this other Mr. Nerio, you go at the bottom and I noticed this record intensive stuff can get confusing, but you look at it and the last four numbers and phone number is zero four two two. All right. And then you go to page two 53 of the record. And agent King testifies that that phone number never came up in the investigation. So this other Mr. Nerio's phone number never even appeared to be calling Mr. Jones. So there's no evidence that this other Mr. Nerio ever made a call to Mr. Don't even set the transaction. Now, the only thing that they have that somehow associates with Capitol Lane address is pages. Okay, let me go again. It is pages 176 and 177. Who wants to have your own disclosure again? I just lost him again. We can hear you. Okay. They can hear. Okay. Yes, we can hear you. Okay. I'm sorry. The screen keeps going in and out and I apologize. We go to page 176 to 177. And it's at the bottom of that page that they seem to be hanging their hat on that this Capitol Lane address was in everybody's mind. There is nothing here to show that they somehow associated this Capitol Lane address with this Carlos Nerio or that there was all this confusion. There's I don't read anything in that then page 176 177. Maybe I'm missing something. I don't see it. Okay. Bottom line on this, and I guess my time is running down the bottom line on this, y'all. First of all, the affidavit itself passes the France versus Delaware test. Okay, it passes that test. Secondly, because it passes that test, we have intermediate in the magistrate insulation. But what's also important is I think what this all shows when you go through all the evidence. Okay. This claim was originally brought as I read it as a pure false arrest claim. So a officer is entitled to qualified immunity if either an affidavit insulates him, the affidavit for arrest, or there's probable cause and there's more than enough probable cause. There's evidence to show that agent evidence Evans knew there was control purchases with this Mr. Dones. He did it himself. The wiretap shown that Mr. Nerio, a phone number associated with him was calling Mr. Dones. They get the driver's license of Mr. Dones, of Mr. Nerio here. It shows him living on the road, wandering away. They have him driving away from Mr. Dones' house with a car registered to him. Agent Evans drives by the house, sees other cars registered to this Mr. Nerio, which appears on his driver's license. They interrupt the drug buy where they clearly buying drugs. There's more than enough reason for a reasonable officer to believe that he had probable cause. There's more than enough because it isn't whether necessarily there's probable cause in a false arrest claim in the context of qualified immunity. It's a question of whether a reasonable officer would believe he had probable cause. And there's more than enough in the record to show that he does. And for all these reasons, I think I'm just better to stop right here while I still have you. For all these reasons, Your Honor, we would ask that the court affirm the summary judgment based upon entitlement to qualified immunity and affirm the judgment of the court. Thank you very much for your time. I apologize for all the technical problems. That's all right, Mr. Dones. All right, Mr. Greenstein, Roboto. To answer the question about whether Officer Evans knew that there were two different Carlos Nerios on page 208, starting in 207. Okay, so you were shown the photographs of the two people in exhibits 106 and 137. Is that correct? I can't be specific. That's the same pictures, but they are what I recall. Yes, they appear to be the same. And you were shown the pictures prior to the arrest of Mr. Nerio or after, prior. And who showed them to you? Lieutenant King. Okay, I think it may have been Lieutenant Leggett, but I think it was Lieutenant King. Where did these take place? At our office. In the circumstances, we were corroborating information that we had through surveillance in Title III. So why were these pictures of two different Carlos Nerios shown to you? Was there some discussion that maybe the wrong Carlos Nerio was going to be arrested? No. Do you know why there were two pictures shown to you of Carlos Nerio? Because as Evans responds, there's two people that come up in the driver's license database system that have the same name. And were these two pictures shown to you before you wrote your probable cause affidavit? Yes. So at the time he wrote his probable cause affidavit, he was aware that there were two different Carlos Nerios. Officer King, in her testimony on 171, um, was asked, you've not seen Mr. Nerio. Have you ever seen Mr. Nerio prior to today? No, I have not. Just his driver's license photo. And that's really a question I want to ask you. If you had been provided this photo of Carlos Henry Nerio on 137 Exhibit before Mr. Nerio, my client, was arrested, because you had given information that the other team members had Mr. Nerio, my client, would the presence of this additional photo of an additional Mr. Nerio have warranted further investigation in your view? And she answers, yes. So both Officer King at her deposition and Officer Evans at his deposition was aware that there were two Carlos Nerios when they pulled up the photos. But that's not enough, is it, Mr. Greenstein? Don't you have to also be aware which one is the right one and which one is the wrong one? You can know that there were two. I live in a small town and there are at least four other guys with the same name as I had. I hope none of them end up getting me arrested. But wouldn't the officer have to know just that there's more than one, but which one is the right one? He would. And I'm assuming that the other three people with the same name as you do not look exactly like you do. And Officer Evans had seen the Carlos Nerio who committed the drug buy. He saw what he looked like. And then he compared the two photographs. What's the evidence that he got a good look at Nerio at the house when the silver truck drove away? Is there evidence that he got a good look at Nerio? There is evidence that he saw. There's no evidence to the contrary that he did not. The evidence is that he was on surveillance and that he saw him walk up, go inside. Officer Evans never testified that he only got a glimpse of him, that he saw him just for a brief moment or that he had anything but a full opportunity to see Mr. Nerio do the drug buy. The surmise that he only had a short time is merely surmise. There's no evidence to contrary that's been presented by the appellee that it was a brief glance, it was just a few minutes, or he never got a chance to see him. And in fact, they had put in cameras in the two, he testified, that were in the trees. So theoretically, he could have seen when he When we're talking about a summary judgment, it seems to me that that there is sufficient evidence to show that he saw what Carlos Nerio looked like and then arrested the wrong person. I believe my time is up. Thank you. Do you have a question, Judge Oldham? Do you mind if I ask one quick one final question? I'm sorry. No, go right ahead. I just wanted to make sure that he answered yours. I didn't want to jump in. Counselor, your client's name is Carlos Nerio, the second? Yes. It's not Carlos Nerio, the third? No. So even though there is an affidavit signed by your client on page 243 that identifies your client as Carlos Nerio, the third, we're supposed to just say that that is your client is confused about his own name? Or that I miswrote the affidavit, but he's the second and the other Carlos Nerio is the junior. But nobody's the third. Not that's in this case, not to my knowledge. No. But it was just that you. It was an error. Screwed up the affidavit. To use a legal term. Yes. Very good. Thank you. All right. Thank you, counsel. Thanks to both of you. Thank you. We will take this matter under advisement and we stand adjourned for the for the morning.